**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILL CO., LTD., a limited liability company organized under the laws of Japan, | No. 21-35617 |
| *Plaintiff-Appellant*, | D.C. No. 3:20-cv-05802-BHS |
| v. | |
| KA YEUNG LEE, an individual; YOUHAHA MARKETING AND PROMOTION LIMITED, a foreign company; DOES, 1–20, doing business as ThisAV.com, | OPINION |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted May 18, 2022
Seattle, Washington

Filed August 31, 2022

Before: Kim McLane Wardlaw, Ronald M. Gould, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Wardlaw

# SUMMARY[*]

### Personal Jurisdiction

The panel reversed the district court's dismissal of a copyright suit for lack of specific personal jurisdiction and remanded for further proceedings.

Will Co. Ltd., a Japanese adult entertainment producer, brought this copyright infringement action against the owners and operators of ThisAV.com, a video-hosting site based in Hong Kong, alleging that the site was displaying without authorization several of its copyrighted works. The district court found that it lacked specific personal jurisdiction over ThisAV.com's owners and operators because Will Co. could not establish that they "expressly aimed" ThisAV.com's content at the United States market, or that it was foreseeable that operating the site would cause jurisdictionally significant harm in the United States. Defendants were Youhaha Marketing and Promotion Limited ("YMP") and Ka Yeung Lee.

The panel held that under Federal Rule of Civil Procedure 4(k), the federal long-arm statute, a federal court may exercise jurisdiction over a foreign defendant if: (1) the claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) exercising jurisdiction comports with due process. Defendants conceded the first two elements. As to the third element, the exercise of personal jurisdiction over a defendant comports with due process if a defendant

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

has "minimum contacts" with the relevant forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.  In the context of tort claims, like the Copyright Act claims at issue here, a defendant has the requisite minimum contacts with the forum if: (1) the defendant purposefully directs its activities at the forum, (2) the lawsuit arises out of or relates to the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable.

To determine whether defendants purposefully directed their activities at the forum, the panel applied the "*Calder* Effects Test" and asked whether defendants: (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.  As to the first element, the panel concluded that both YMP and Lee committed at least one intentional act by operating ThisAV.com and purchasing its domain name and domain privacy services.  As to the second element, both defendants did "something more" than mere passive operation of the website.  Their advertising structure demonstrated that they profited from viewers in the United States market, and their intent to cultivate an audience in the United States was demonstrated by their choice to host the website in Utah and to purchase content delivery network services for North America, which made the site load faster for viewers there, and by the fact that the webpages they posted on the site that addressed legal compliance were relevant almost exclusively to viewers in the United States. As to the third element, defendants' conduct caused harm in the United States because there were almost 1.3 million visits to their website in the United States during the relevant period, and that harm was foreseeable.

The panel held that defendants "purposefully directed" their operation of ThisAV.com at viewers in the United States. The panel reversed and remanded to the district court to conduct the remainder of the personal jurisdiction analysis under Rule 4(k).

## COUNSEL

Spencer D. Freeman (argued), Freeman Law Firm Inc., Tacoma, Washington, for Plaintiff-Appellant.

Evan Fray-Witzer (argued), Ciampa Fray-Witzer LLP, Boston, Massachusetts; Valentin Gurvits and Frank Scardino, Boston Law Group PC, Newton, Massachusetts; Philip P. Mann, Mann Law Group PLLC, Seattle, Washington; for Defendants-Appellees.

## OPINION

WARDLAW, Circuit Judge:

Will Co. Ltd., a Japanese adult entertainment producer, brought this copyright infringement action against the owners and operators of ThisAV.com, a video-hosting site based in Hong Kong, alleging that the site was displaying without authorization several of its copyrighted works. The district court dismissed the suit, finding that it lacked specific personal jurisdiction over ThisAV.com's owners and operators because Will Co. could not establish that they "expressly aimed" ThisAV.com's content at the United States market, or that it was foreseeable that operating the site would cause jurisdictionally significant harm in the

United States.  We disagree, and reverse and remand for further proceedings.

## I.

### A.

Will Co. Ltd. is a Japanese entertainment company that produces adult videos featuring Japanese models in Japanese environments.  The firm has produced more than 50,000 full-length videos and has registered in the United States for copyright protection for all of them.  It sells access to its videos exclusively on R18.com, and makes over one million dollars a year selling its content to consumers in the United States.

To protect its market share, Will Co. actively investigates and reviews sites that display Japanese erotica for free looking for instances of copyright infringement.  In June 2020, the firm discovered that one of those sites, "ThisAV.com," was displaying thirteen of its videos without permission.  It sent ThisAV.com take-down notices pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c).  When the works were not removed, Will Co. brought this suit against Does 1–20 under the Copyright Act, 17 U.S.C. § 101 *et. seq.*  After limited discovery, revealing that Youhaha Marketing and Promotion Limited ("YMP") owns ThisAV.com, and Ka Yeung Lee ("Lee") serves as a Director of YMP, Will Co. named them as Defendants.

Shortly thereafter, Defendants moved to dismiss this lawsuit under Rule 12(b)(2) for lack of personal jurisdiction.  Will Co. conceded that the district court lacked general personal jurisdiction over either defendant.  Lee is a permanent resident of Hong Kong and currently resides in

Canada, and YMP is registered in Hong Kong and operates ThisAV.com exclusively out of its offices there.  However, Will Co. asserted that the district court had specific personal jurisdiction over both defendants because the tortious conduct in which they allegedly engaged, running ThisAV.com, which unlawfully displayed copyrighted videos, was sufficiently connected to the United States.

In their briefing before the district court, the parties asserted the following relevant facts about the operation of the site.  ThisAV.com is a Japanese-language video-hosting website.  Like YouTube, it allows users to upload and view videos for free and makes its money by displaying ads alongside those videos.  As of February 2021, there were a total of 221,541 user-uploaded videos on the site.  The majority of those videos had titles written in the Japanese alphabet and were in Japanese.

Defendants Lee and YMP created the site and purchased its domain name (ThisAV.com).  They acquired hosting services from an American company, Gorilla Servers, with servers in Utah.  They purchased content delivery network (CDN) services from Cloudflare, another American company, and utilized Cloudflare's network of servers in North America and Asia.  And they purchased a website template with some pre-existing text and images, which they modified to suit their needs.

Most of the website's text is in Japanese.  However, all of the pages focused on legal compliance are in English and are geared toward compliance with United States law.  The "Privacy Policy" page states that it is legal to access the site in the United States, but makes no guarantees about the legality of access from other nations:

[ThisAV.com] is a website available from its location in the United States of America. We at ThisAV.com do not warrant or make any discretion about its appropriate use and availability outside the aforementioned country. If the ThisAV.com website is accessed outside of the relevant location, those users must comply with their local jurisdiction regarding website access and usage.

The "Terms and Conditions" page states that the content on the site is "subject to copyright and other intellectual copyright under United States, Canada and other foreign laws and international conventions." And finally, two related pages entitled "DMCA" and "2257" provide the site's procedures for compliance with two United States laws, the Digital Millennium Copyright Act,[1] 17 U.S.C. § 512(c), which implements international agreements regarding copyright protection, and 18 U.S.C. § 2257,[2]

---

[1] The "DMCA" page states: "In accordance with the Digital Millennium Copyright Act of 1988 . . . Thisav will respond expeditiously to claims of copyright infringement that are reported to Thisav's designated copyright agent identified below. Please also note that under Section 512(f) any person who knowingly materially misrepresents that material or activity is infringing may be subject to liability . . . All claims of . . . copyright infringement on or regarding this Website should be delivered to Thisav's designated copyright agent at the following email address: copyright@thisav.com . . . ."

[2] The "2257" page states: "With respect to the records as per 18 USC 2257 for any and all content on this site please all kindly direct your request to the site for which the content was produced . . . [F]or further assistance and/or information in finding the content's originating site, please contact ThisAV.com compliance at compliance@thisAV.com."

which requires that producers of adult content keep records of all performers' dates of birth and other information.

While YMP and Lee set up the site, they have a relatively limited role in operating it on a day-to-day basis. They do not themselves post any content, as all of the videos on the site are uploaded by users. Nor do they place any ads; rather, they sell all of the advertising space on the site to third-party vendors.[3] Several of those third-party ad vendors use geo-targeting to place their ads, which means that viewers in a particular location are served ads relevant to that location. So, for example, a person visiting the site from China might receive an ad in Chinese for a hotel in Beijing, while a person visiting the site from the United States might receive an ad in English for a hotel in Chicago.

Most of ThisAV.com's viewers are located in Asia. However, the site has a significant audience in the United States. During the period the allegedly infringing videos were on display, April 1, 2020 to June 30, 2020, the site was viewed approximately 28 million times. Nearly 85% of those views came from three countries: Japan (52.5%), Taiwan (15.7%), and Hong Kong (15.4%). Although only 4.6% of the views came from within the Unites States, that percentage amounted to more than 1.3 million views.

**B.**

On June 30, 2021, the district court granted Defendants' motion to dismiss for lack of personal jurisdiction. It held that Will Co. failed to establish two necessary elements for

---

[3] YMP admits that it did contract directly with one advertiser on one occasion, but that advertiser was based in Hong Kong, and the advertisement it placed was not directed at the United States.

specific personal jurisdiction: that the content on ThisAV.com was "expressly aimed" at the United States, and that by operating ThisAV.com Defendants caused "jurisdictionally significant harm." The district court determined that Will Co. failed to establish the Defendants had expressly aimed the site's contents at the United States, reasoning that the jurisdictional facts here are indistinguishable from those of a recent Ninth Circuit case, *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201 (9th Cir. 2020), in which we found against jurisdiction because the defendant had not expressly aimed the operation of his website at the United States. And the district court held that there was no jurisdictionally significant harm because during the relevant period only 4.6% of the site's viewers were in the United States, so the "brunt of the harm" had occurred elsewhere. This timely appeal followed.

## II.

We review the district court's dismissal for lack of personal jurisdiction de novo. *See Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). When a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). When the Defendant's motion is based on written materials rather than an evidentiary hearing, as is the case here, "we only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie showing of personal jurisdiction." *Id.* (alteration in original) (quoting *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995)). Uncontroverted allegations in the complaint must be taken as true, and conflicts between parties over statements

contained in affidavits must be resolved in the plaintiff's favor. *Id*.

### III.

Federal Rule of Civil Procedure 4(k) governs personal jurisdiction in federal court. In this case, Will Co. contends the district court erred by dismissing this action because it has specific personal jurisdiction[4] under Rule 4(k)(2), often referred to as the federal long-arm statute.

### A.

Under Rule 4(k)(2), a federal court may exercise jurisdiction over a foreign defendant if: (1) the claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) exercising jurisdiction comports with due process. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006). Defendants concede that Will Co.'s claim arises under federal law and that they are not subject to jurisdiction in any state court of general jurisdiction, so the determinative question here is whether the exercise of jurisdiction over them comports with due process.

The exercise of personal jurisdiction over a defendant comports with due process if a defendant has "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play

---

[4] A court may exercise either "general" or "specific" personal jurisdiction over a defendant. *Easter v. Am. W. Fin.*, 381 F.3d 948, 960 (9th Cir. 2004). Will Co. concedes that the court lacks general jurisdiction over Defendants, so the only issue is whether the court has specific personal jurisdiction over Will Co.'s claims against Lee and YMP.

and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted); *see also Schwarzenegger*, 374 F.3d at 801. In the context of tort claims, like the Copyright Act claims at issue here, a defendant has the requisite minimum contacts with the forum if: (1) the defendant "purposefully direct[s]" its activities at the forum, (2) the lawsuit "arises out of or relates to the defendant's forum-related activities", and (3) the exercise of jurisdiction is "reasonable." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227–28 (9th Cir. 2011) (internal citations omitted).

This appeal revolves around prong one of that test: whether Defendants "purposefully directed" the content of ThisAV.com at the United States. To determine whether a defendant "purposefully directed" its activities at the forum, we apply the "*Calder* Effects Test" and ask whether the defendant: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)); *see also Calder v. Jones*, 465 U.S. 783 (1984). We analyze those factors in turn.

**B.**

Both YMP and Lee committed at least one "intentional act." For the purposes of personal jurisdiction, a defendant acts intentionally when he acts with "an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806. We have held that "operating a passive website," purchasing a domain name and purchasing domain privacy services are all intentional acts. *AMA Multimedia*, 970 F.3d at 1209 (citation omitted);

*see also Pebble Beach*, 453 F.3d at 1156.  It is undisputed that YMP operated ThisAV.com, and that Lee purchased its domain name and domain privacy services.  Thus, the first purposeful direction element is readily satisfied.

## C.

Whether Lee and YMP "expressly aimed" ThisAV.com at the United States market is a closer question.  In examining whether "tortious conduct on a [globally] accessible website is expressly aimed at any, or all, of the forums in which the website can be viewed," we look to the actions of the operators in operating the site.  *Mavrix*, 647 F.3d at 1229.  Mere passive operation of a website is insufficient to demonstrate express aiming.  *See AMA Multimedia,* 970 F.3d at 1209–1210 (citation omitted) (requiring "something more" than simply making the website accessible in the forum).  Rather, the operator must have both actively "appeal[ed] to" and "profit[ed] from" an audience in that forum.  *Id.* at 1210.

For example, in *Mavrix Photo Inc., v. Brand Technologies, Inc.*, 647 F.3d 1218 (9th Cir. 2011), Mavrix Photo, an agency that licensed candid photos of celebrities to publications like *People* and *US Weekly* magazines, sued Brand Technologies and Brad Mandel (collectively "Brand"), who operated the celebrity gossip website celebrity-gossip.net, for copyright infringement in the Federal District Court for the Central District of California.  *Id*. at 1221–24.  Mavrix alleged that Brand had displayed several of its copyright protected photos on celebrity-gossip.net without its permission.  *Id*. at 1223.  Brand moved to dismiss, arguing the Central District of California lacked specific personal jurisdiction.  *Id*.

We held that Brand had "expressly aimed" the content of celebrity-gossip.net at the California market because it had both appealed to and profited from consumers there.  *Id.* at 1229.  It appealed to the California market by posting stories and ads that were particularly relevant to California consumers.  For example, it posted stories about the "the California-centered celebrity and entertainment industries," and ads for jobs, hotels, and vacations in California.  *Id.* at 1222, 1230.  And it "profit[ed] from" California consumers through advertising revenue. *Id.* at 1231.  Brand made its money by selling the advertising space on its website to third-party advertisers, so "the more visitors there [were] to the site, the more hits that [were] made on the advertisements; the more hits that [were] made on the advertisements, the more money that [was] paid by the advertisers to Brand."  *Id.* at 1230.  Therefore, because "[a] substantial number of hits to Brand's website came from California residents," California consumers had generated a substantial profit for the firm.  *Id.*

By contrast, in *AMA Multimedia v. Wanat,* 970 F.3d 1201 (9th Cir. 2020), we found that AMA, an adult entertainment producer, had not met its burden to show that the defendant Marcel Wanat, the operator of ePorner.com, an adult-video-hosting site similar to ThisAV.com, had actively appealed to the United States market.  *Id.* at 1204.  Unlike in *Mavrix*, the content of the site's videos and advertisements provided no evidence of Wanat's subjective intent to appeal to or profit from users in any particular forum because all of the videos were uploaded by users, and all of the advertisements were placed by third parties not located in the United States who tailored the advertising themselves.  *Id.* at 1210–11.  Thus, although over 20% of ePorner.com's traffic derived from United States users, that fact shed little light on whether ePorner.com was expressly

aimed at those users in light of the advertising structure it employed. *Id.*

AMA pointed to two other pieces of evidence that Wanat had actively targeted the United States market, both of which we rejected. First, AMA pointed to Wanat's choice to use Tiggee as a domain service provider. Tiggee advertised itself as one of the fastest domain service providers for site visitors in the United States. *Id.* at 1212. However, AMA adduced no evidence that Wanat had selected Tiggee or was motivated to do so because he wanted to appeal to U.S. viewers. *Id.* Second, AMA argued that every website visitor assented to the site's Terms of Service. Therefore, Wanat had entered into a contract with every person who used the site, including visitors in the United States. *Id.* We explained that while those terms of service "could create specific jurisdiction in the United States for [suits alleging] violation of those terms," they "[did] not evince Wanat's or ePorner's effort to target the U.S. market" because they were irrelevant to Wanat's subjective intent. *Id.* Therefore, even though Wanat had likely profited from the forum—nearly 20% the site's traffic came from the United States— Plaintiffs did not meet their burden to show he had actively appealed to consumers in the U.S., so there was no "express aiming." *Id.* at 1211.

Here, unlike in *AMA Multimedia*, Will Co. met its burden of showing "something more" to demonstrate that Defendants "appeal[ed] to" and "profit[ed] from" the U.S. market. *Id.* at 1210. First, the advertising structure Defendants employed demonstrated that they profited from viewers in the United States market. Like the Defendants in *Mavrix*, ThisAV.com "makes its money by selling advertising space on its website to third-party advertisers," so "the more visitors there are to the site, the more hits that

are made on the advertisements; [and] the more hits that are made on advertisements, the more money that is paid by the advertisers to [YMP and Lee]." *Mavrix*, 647 F.3d at 1230. Therefore, because ThisAV.com was viewed by people in the United States more than 1.3 million times during the relevant period, the site earned considerable revenue from that market.

Whether Defendants intentionally appealed to U.S. consumers is a closer question. However, unlike the Plaintiff in *AMA*, Will Co. provided evidence that Defendants made at least two key choices demonstrating their intent to cultivate an audience in the United States.

First, Defendants chose to host the website in Utah and to purchase content delivery network services for North America, which reduced the time it takes for the site to load in the United States. The time it takes for a site to load, sometimes referred to as a site's "latency," is critical to a website's success.[5] For one, swift loading is essential to getting users in the door. The faster a site loads in a particular location, the better its search engine optimization (SEO) will be there, that is, the higher it will appear in search engine results as compared to competitors.[6] Appearing early in search results is critical to attracting web traffic. Studies show that 93% of online experiences begin with the user

---

[5] *See What is a CDN? How do CDNs Work?*, Cloudflare, available at https://www.cloudflare.com/learning/cdn/what-is-a-cdn/ (last visited Aug. 9, 2022); *What is Latency?*, Cloudflare, https://www.cloudflare.com/learning/performance/glossary/what-is-latency/ (last visited Aug. 9, 2022).

[6] *See How Site Speed Influences SEO*, Yoast, https://yoast.com/how-site-speed-influences-seo/ (Nov. 13, 2018) (last visited Aug. 9, 2022).

typing something into a search engine,[7] and that the results on the first page receive nearly 92% of overall traffic for that term.[8] Swift loading is also crucial to keeping potential site visitors engaged. Research shows that sites lose up to 10% of potential visitors for every additional second a site takes to load,[9] and that 53% of visitors will simply navigate away from a page that takes longer than three seconds to load.[10] Even tiny differences in load time can matter. Amazon recently found that every 100 milliseconds of latency cost it 1% in sales.[11]

There are a few ways sites can make their pages load faster. For one, the site's operators can choose to host their

---

[7] *See* AJ Agarwal, *How To Optimize Your SEO Results Through Content Creation*, Forbes, https://www.forbes.com/sites/ajagrawal/2017/08/30/how-to-optimize-your-seo-results-through-content-creation/?sh=28612ea2aa37 (Aug. 30, 2017) (last visited Aug. 9, 2022).

[8] *See* Kelly Shelton, *The Value of Search Results Rankings*, https://www.forbes.com/sites/forbesagencycouncil/2017/10/30/the-value-of-search-results-rankings/?sh=56b02d0544d3 (Oct. 30, 2017) (last visited Aug. 23, 2022); Alex Valencia, *Why SEO Still Matters in 2020*, Forbes, https://www.forbes.com/sites/forbesagencycouncil/2020/03/10/why-seo-still-matters-in-2020/?sh=86686b734b14 (Mar. 10, 2020) (last visited Aug. 9, 2022).

[9] *See* Matthew Wall, How Long Will You Wait For a Shopping Website to Load, BBC News, https://www.bbc.com/news/business-37100091 (Aug. 19, 2016) (last visited Aug. 9, 2022).

[10] *See Consumer Insights*, Google Data, https://www.thinkwithgoogle.com/consumer-insights/consumer-trends/mobile-site-load-time-statistics/ (last visited Aug. 9, 2022).

[11] *See Amazon Study: Every 100ms in Added Page Load Time Cost 1% in Revenue*, ContentKing, https://www.contentkingapp.com/academy/page-speed-resources/faq/amazon-page-speed-study/ (Aug. 10, 2021) (last visited Aug. 22, 2022).

site on servers near their desired audience.  The closer a viewer is located physically or geographically to the host server, the faster that page will load for the viewer.[12] Second, the site's operators can purchase access to a content delivery network (CDN), a distributed network of servers covering a particular geographic area, which permits users to access the site from any server in the network, not just the host server, and thus decreases the distance between users and the server.[13]  This allows persons within the area covered by the CDN to access the site more quickly.

In this case, by choosing to host ThisAV.com in Utah and to purchase CDN services for North America, Defendants chose to have the site load faster for viewers in the United States and slower for viewers in other places around the world.  Given how important loading speed is to achieving and maintaining an audience, Defendants' choice is good evidence that they were motivated to appeal to viewers in the United States more than any other geographical location.

Second, the webpages Lee and YMP posted on the site that address legal compliance are relevant almost exclusively to viewers in the United States.  The "Privacy Policy" page specifically guarantees that it is lawful for persons in the United States to access ThisAV.com, but provides no such guarantee for persons in other nations:

---

[12] *See What is Latency?,* Cloudflare, https://www.cloudflare.com/learning/performance/glossary/what-is-latency/ (last visited Aug. 9, 2022).

[13] *What is a CDN? How do CDNs Work?*, Cloudflare, https://www.cloudflare.com/learning/cdn/what-is-a-cdn/ (last visited Aug. 9, 2022).

> ThiaAV.com [sic] is a website available from its location in the United States of America. We at ThisAV.com do not warrant or make any discretion about its appropriate use and availability outside the aforementioned country. If the ThisAV.com website is accessed outside of the relevant location, those users must comply with their local jurisdiction regarding website access and usage.

Further, while the "Terms and Conditions" page states that the content on the site is "subject to copyright and other intellectual copyright under United States, Canada and other foreign laws and international conventions," the site provides specific pages dealing with compliance with United States law only: the "DMCA" page and the "2257" page. Notably, while the majority of the site is in Japanese, the legal compliance pages are in English, and thus readily comprehensible to the average person in the United States.

Defendants' counterarguments are unavailing. First, they object to two of Will Co.'s factual assertions. They object to Will Co.'s assertion that the CDN they purchased only decreases latency in North America and Asia, arguing that it actually decreases latency all around the world. However, at this stage, we resolve factual disputes in favor of the plaintiff, so we must assume that the CDN Defendants purchased decreased load times in North America and Asia only. *See Schwarzenegger*, 374 F.3d at 800.

Defendants also object to Will Co.'s assertion that they intentionally posted the compliance pages. They claim that the content on those pages came with the website template they purchased, and that they inadvertently failed to remove

it.  Will Co. counters that even if those pages came with the
template Defendants used, they chose to customize them
with their own contact information, which demonstrates they
knew the pages existed and made the decision to keep them.
Again, at this stage we resolve factual disputes in favor of
the plaintiff, so for the purposes of resolving this motion, we
must assume that Defendants intended to post the content
that appears on the compliance pages, and thus that it is
evidence of their subjective intent to target the U.S. market.
*Id.*

Second, Defendants point to several cases holding that
the location of a site's server alone cannot establish express
aiming.  However, the authority they cite simply states that
the location of the server *alone* is insufficient to establish
personal jurisdiction, not that it is irrelevant to the analysis.
*See, e.g.*, *Hungerstation LLC v. Fast Choice LLC*, No. 20-
15090, 2021 WL 1697886, at *2 (9th Cir. Apr. 29, 2021)
("Our circuit has never decided that personal jurisdiction is
proper over a private foreign entity *solely* because that entity
engaged in tortious conduct from a location outside of the
United States by remotely accessing servers located in the
United States.") (emphasis added).

Finally, Defendants argue that the evidence of
intentionality shows only that they anticipated persons in the
United States might access the site and therefore prepared
for them, not that they specifically sought out those viewers.
Defendants are correct that the fact that a site's operators
anticipated persons from a particular forum might access the
site is not enough to show they actually desired those
viewers.  *See AMA Multimedia*, 970 F.3d at 1210 ("Although
Wanat may have foreseen that ePorner would attract a
substantial number of viewers in the United States, this alone
does not support a finding of express aiming.").  So here, it

would be insufficient for Defendants to have simply anticipated people from the United States might access ThisAV.com and to have set up pages to make sure they could do so lawfully. But in this case, Defendants did significantly more than that. In addition to the hosting and CDN, the site specifically states that access is *only* lawful in the United States, and provides compliance procedures *only* for the United States, which means it prepared for U.S. visitors to the exclusion of all others.

Therefore, we find that the Defendants both appealed to and profited from a United States audience, and thus expressly aimed the site at the United States.

## D.

Finally, Will Co. must show that the conduct at issue caused harm in the United States, and that that harm was foreseeable. *See Keeton v. Hustler Magazine,* 465 U.S. 770, 776 (1984); *see also Dole Food Co.*, 303 F.3d at 1113.

A defendant causes harm in a particular forum when the "bad acts" that form the basis of the plaintiff's complaint occur in that forum. *Mavrix*, 647 F.3d at 1231. If a Defendant's actions cause harm in multiple fora, jurisdiction is proper in any forum where a "sufficient" amount of harm occurs, even if that amounts to only a small percentage of the overall harm caused. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc) ("We take this opportunity to clarify our law and to state that the 'brunt' of the harm need not be suffered in the forum state. If a jurisdictionally sufficient amount of harm is suffered in the forum . . . it does not matter that even more harm might have been suffered in another [forum]."). For example, in *Keeton v. Hustler Magazine,* 465 U.S. 770 (1984), the Supreme Court held that New Hampshire had

personal jurisdiction over the publisher of a national magazine, Hustler, even though just over one percent of sales occurred in that state, because that one percent still amounted to "a substantial number of copies." *Id*. at 780–81. We find this case is closely analogous to *Keeton*. While just 4.6% of ThisAV.com's views occurred in the United States during the relevant period, that amounted to over 1.3 million visits, an undeniably "substantial" number. *See also AMA Multimedia*, 970 F.3d at 1220 (Gould, J., dissenting).

We also find that the harm was foreseeable. The operators of ThisAV.com actively appealed to a U.S. audience, knew that a significant number of people in the United States were actually viewing the website, and were put on notice that they were hosting infringing content when Will Co. sent them a takedown notice. In light of that, it's hard to see how Defendants could have failed to anticipate the harm that occurred in the forum.

## IV.

For the reasons stated above, we conclude that Defendants "purposefully directed" their operation of ThisAV.com at viewers in the United States. We **REVERSE**, and **REMAND** to the district court to conduct the remainder of the personal jurisdiction analysis under Rule 4(k).